UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ANTONY M. FARMER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case number 4:11cv1947 TCM |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the applications of Antony Farmer (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the undersigned for a final disposition pursuant to the written consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of her answer.

## Procedural History

Plaintiff applied for DIB and SSI in March 2005, alleging he was disabled as of August 2, 2003, by a cervical disc pinching his spine and by numb hands.  His applications were denied initially and after a December 2006 administrative hearing.  (R.[2] at 46-59, 623-40.)

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and is hereby substituted for Michael J. Astrue as defendant.  See 42 U.S.C. § 405(g).

[2]References to "R." are to the administrative record filed by the Commissioner with her answer.

The Appeals Council remanded with directions that the ALJ obtain additional evidence about Plaintiff's impairments and evidence from a vocational expert about the affect of Plaintiff's nonexertional limitations on his occupational base.  (Id. at 62-64.)  Following a September 2007 hearing, the applications were again denied by same ALJ.  (Id. at 65-78, 605-22.)  The Appeals Council remanded for consideration by a different ALJ.  (Id. at 79-83.) Following that ALJ's adverse decision, the Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 6-9.)

## **Testimony Before the ALJ**

Plaintiff, represented by counsel, was the only witness to testify at the first and second hearings.

Plaintiff testified that the majority of his pain originated in his left arm.  (Id. at 626.) His left leg was weak, requiring that he use a cane and, sometimes, a brace.  (Id.)  He wears a back brace when standing or sitting.  (Id. at 627.)  His left knee is very weak.  (Id. at 628.) He takes Metformin for his diabetes, Naproxen for pain, Amitriptyline for depression, and Neurontin for nerves.  (Id. at 629.)  He saw a doctor at Barnes Jewish Hospital for depression in 2005, and had an appointment for a psychological evaluation within the next month.  (Id. at 630.)  Dr. Wells had recommended it.  (Id.)  He was being evaluated by a pain management center.  (Id. at 632.)  And, it was recommended that he go through more physical therapy and have steroid injections in his neck.  (Id.)

He paces himself when doing household chores.  (Id. at 633.)  He cannot "carry hot stuff" or use knives because of he numbness and weakness in his hands.  (Id.)  He does not

carry anything in his left hand.  (Id.)  Eighty-five percent of the time, he uses a cane.  (Id. at 634.)  He last worked in food service in 2003 or 2004.  (Id. at 635.)  The year before, he had tried working a part-time job at a school cafeteria, but could not do all that was expected.  (Id.)

Rating his pain on a ten-point scale, with ten being the most severe, Plaintiff described his neck pain as an eight to nine without medication and a five to six with medication.  (Id. at 637.)  His low back pain was a seven or eight.  (Id. at 637.)

Plaintiff testified at the second hearing that his continuing neck pain was starting to affect his right hand, having already affected his left hand.  (Id. at 608.)  He has a limited range of motion in his neck.  (Id. at 609.)  He was continuing to take pain medication and Metformin for his diabetes.  (Id. at 611-12.)

Plaintiff explained that the primary reason he could not perform any work was the danger of losing a limb or falling and becoming unconscious in the workplace.  (Id. at 614-15.)  Being around sharp objects and hot things posed a danger to him.  (Id. at 615.)

Plaintiff does not drive.  (Id. at 617.)

At the third, December 2008, hearing, Plaintiff and Delores E. Gonzalez, M.Ed., testified.

Plaintiff testified that he was then 43 years old, 5 feet 8 inches tall, is right-handed, and weighs approximately 205 pounds.  (Id. at 545.)  He is married and lives with his wife and two of his five children.  (Id. at 546.)  He receives food stamps and is on Medicaid.  (Id. at 547.)

Plaintiff last worked in 2003.  (Id. at 549.)  He was then a broiler chef at a restaurant. (Id.)  When asked about earnings in 2006, he testified that he had worked part-time as a line server in a school cafeteria for a few months and had been laid off after being offered a full-time job that he could not perform due to the lifting requirements.  (Id. at 550-51.)  He had also worked at a restaurant for approximately three weeks as a dishwasher and busboy.  (Id. at 551.)  He had applied for work at another, small restaurant, but had not been hired.  (Id. at 552.)  Plaintiff has worked as a lead prep chef, saute chef, production chef, server, breakfast chef, and sandwich and pizza chef.  (Id. at 556-59.)

Asked if he would work again at a restaurant if he could, Plaintiff replied he would as long as he did not have to carry heavy items.  (Id. at 553.)

Plaintiff testified that he wakes up at 6 a.m., wakes his children, gets them ready for school, rides with them on a bus to school,[3] and stays at school and works as a volunteer.  (Id. at 560-63.)  He is able to sit down when doing volunteer work at school.  (Id. at 562.)  On the days he is not at school, he sleeps and relaxes.  (Id. at 563-64.)  He sometimes cooks at home, but does not "do too much hot stuff."  (Id. at 564.)  His wife does the laundry.  (Id.)  He puts away dishes and helps his wife change the bed linens.  (Id.)  He does not mop or vacuum, but sometimes sweeps.  (Id. at 564-65.)  He goes grocery shopping with his wife, and can carry a bag of groceries.  (Id. at 565.)  He watches "[l]ots of TV" and reads (Id. at 565-66.)  At least once a week, he goes to the library to check out books, usually about sports or history.  (Id. at

---

[3]Plaintiff later explained that he and his two children take a bus to school because the children are still enrolled in the St. Louis City schools while the family temporarily resides in St. Louis County. (Id. at 584.)

566.)  In the evening, he helps his children with their homework.  (Id. at 567-68.)  On the

weekends, he goes on outings with his children, his sister, and his sister's two children.  (Id.

at 568.)  His sister comes to get them.  (Id.)

Plaintiff takes Percocet for pain in his left arm, left hand, low back, left leg, and,

recently, right knee.  (Id. at 571.)  On a ten-point scale, his pain is an eight to nine before

Percocet and a two or three after.  (Id. at 572.)  At bedtime, he takes Amitriptyline and

Gaviscon, a nerve medicine.  (Id. at 573-74.)  He also takes Neurontin, a muscle relaxer, and

Naproxen, a pain reliever.  (Id. at 574.)  Unlike the Percocet, he takes Naproxen every day.

(Id.)  In the past week, he has taken two Percocet every day.  (Id. at 575.)  He takes Metformin

for his diabetes, which is under control, and medications for his sinuses and allergies.  (Id. at

575-76.)

Plaintiff continues to have pain in his neck.  (Id. at 586.)

Plaintiff wears braces on both legs and on his back.  (Id. at 578.)  The brace for the left

leg and the back were prescribed.  (Id.)  He usually uses a cane, but had forgotten it that

morning until he was at the bus stop and had not wanted to walk back and get it because his

children would be late for school.  (Id. at 584, 585.)

Plaintiff testified that he gets depressed because he is no longer able to provide for his

family.  (Id. at 579.)  His concentration level is at 75 percent.  (Id. at 580.)  The last time he

spoke with a psychiatrist was for his Social Security examination.  (Id.)  The last time he had

physical therapy was two and one-half years ago.  (Id. at 589.)

He cannot walk farther than a block without stopping.  (Id. at 581.)  He has great difficulty stooping, crouching, bending, kneeling, or crawling.  (Id.)

Plaintiff explained that the reference in the emergency room records to him not taking his medicine was that he could not afford them after his Medicaid was stopped.  (Id. at 592-93.)  And, he was not exaggerating his weakness as Dr. Tippett reported.  (Id. at 593.)  Nor was he malingering as Dr. Mades reported.  (Id. at 594-95.)

Ms. Gonzalez testified as a vocational expert (VE).  She classified Plaintiff's past work as a broiler chef as medium, skilled work; as a busboy as medium, unskilled; as a waiter, bartender, cook, and cafeteria worker each as light, semiskilled; as a prep cook as medium, unskilled; as a pizza maker as medium, semiskilled; and as a stocker as heavy, semiskilled. (Id. at 597.)

The ALJ asked her to assume a hypothetical person age forty-three with a high school education and past relevant work as she had described.  (Id. at 597-98.)  This person was capable of performing light work, i.e., he could occasionally lift, carry, push, and pull twenty pounds and frequently do so with ten pounds; could sit, stand, or walk for a total of six hours out of eight; could occasionally reach with the left upper extremity; could only occasionally do fine manipulations with the left hand; could occasionally climb, balance, stoop, crouch, kneel, or crawl; and should not be allowed on ladders, ropes, or scaffolds.  (Id. at 598.)  Asked if such a person could perform any of Plaintiff's past relevant work, the VE replied that he could not due to the bimanual dexterity required for each.  (Id.)  Nor were there any transferrable work skills.  (Id.)

This person could, however, perform the requirements of such representative jobs as a call-out operator and election clerk.  (Id. at 599.)  These jobs existed in significant numbers in the national, state, and local economies.  (Id.)

If the hypothetical person was capable of performing the exertional requirements of sedentary work, occasionally lifting, carrying, pushing, or pulling ten pounds and frequently doing so with less than ten pounds; sitting for six hours out of eight and standing or walking for a total of two hours; only occasionally climbing, stooping, crouching, kneeling, or crawling; and only occasionally using his left upper extremity for reaching or fine manipulation, there would be no transferrable work skills.  (Id.)  The person also could not perform Plaintiff's past relevant work, but could perform the jobs earlier described.  (Id. at 600.)

The VE stated that her testimony was consistent with the *Dictionary of Occupational Titles* (DOT).  (Id.)

In response to questions asked by Plaintiff's counsel, the VE testified that the jobs earlier described could be performed by a person limited to simple repetitive work activities. (Id.)  Nor would these jobs be affected if the person needed to use a cane when walking, was limited to forty minutes at a time when sitting and to fifty-one minutes when standing, and could not kneel, crouch, crawl, use any foot controls, or be on scaffolds or around unprotected heights or moving mechanical parts.  (Id. at 600-01.)  If the person could not drive or use public transportation, his dependency on others for rides to work might compromise the jobs. (Id. at 601.)  If the person could not work with paper files, the election clerk and call-out

operator position would be affected, but not such positions as surveillance system monitor. (Id. at 602.)  If the person was also unable to stay on task due to problems with concentration, attentiveness, or memory, the number of jobs he could perform would be significantly eroded. (Id.)

The job of surveillance system monitor, including gaming surveillance, existed in significant numbers in the national, state, and local economies.  (Id. at 602-03.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's applications, records from health care providers, and various assessments and reports generated pursuant to Plaintiff's applications.

When applying for DIB and SSI, Plaintiff completed a Disability Report.  (Id. at 157-63.)  He listed his height as 5 feet 8 inches tall and his weight as 210 pounds.  (Id. at 157.)  His impairments – the pinching cervical disc and numbing hands – limit his ability to work by preventing him for lifting anything or holding anything in his left hand and by making it hard for him to bend over and stoop.  (Id. at 158.)  The impairments first bothered him on January 24, 2003, and made him unable to work that same day.  (Id.)  He tried to continue to work, however, but stopped working on November 1, 2003, due to his disability.  (Id.)  He had one year of college and had completed a culinary program.  (Id. at 162.)  He was scheduled to soon have surgery.  (Id. at 163.)

Asked to describe on a Function Report what he does during the day, Plaintiff reported in December 2004 that he checks his glucose levels, eats breakfast, takes his medicine, wakes up his daughter, does his physical therapy exercises, talks to his wife, sits and relaxes with his feet up, watches television, wakes his younger son, waits with his son for the school bus, gets the food together for after-school snacks and dinner, eats dinner (prepared by an older son), takes medication, gets ready for bed, waits for his wife to return safely from work, and goes to bed.  (Id. at 149, 156.)  Because of his impairments, Plaintiff has difficulties tying his shoes and using buttons and zippers.  (Id. at 150.)  His wife helps him wash his back and head; his wife and son help him shave.  (Id.)  He cannot lift anything heavy and cannot bend over.  (Id.)  He does not do any household repairs or yard work.  (Id. at 151.)  He mops and sweeps, but both take him time.  (Id.)  Approximately once a month, he shops.  (Id. at 152.)  He has to put his cane in his cart and it takes him at least two hours to shop at two or three stores.  (Id.)  His impairments adversely affect his abilities to lift, squat, bend, stand, reach, walk, kneel, climb stairs, complete tasks, and use his hands.  (Id. at 154.)  He can only walk for approximately a block before having to stop, bend his left knee, and, probably, sit.  (Id.)  He has no difficulty paying attention.  (Id.)  He can follow written and spoken instructions well.  (Id.)  He gets along well with authority figures, but he does not handle stress or changes in routine well. (Id.)

Plaintiff had reportable earnings in the years from 1983 through 2003, inclusive, and 2006. (Id. at 127.)  In 2002, his annual earnings were $6746,[4] in 2003 were $3,266, and in 2006 were $1,030.  (Id.)

The medical records before the ALJ are summarized below in chronological order, beginning with those after January 31, 2004, when Plaintiff's closed period disability ended.[5]

In February 2004, Plaintiff went to the Pain Management Center at Barnes Jewish Hospital (Barnes).  (Id. at 297-308.)  It was a new visit.  (Id.)  He reported an aching, burning, and constant low back pain that was a seven on a ten-point scale, and attributed the origin of the pain to a myelogram he had had before fusion surgery on his neck.  (Id. at 301, 306.)  His neck pain had been relieved by the surgery, but he continued to have numbness and tingling in his both hands and pain in his left hand.  (Id.)  Precipitating factors were bending, sitting, standing, and walking; alleviating factors were massage, rest, medication, and heating pads. (Id. at 299, 300, 306.)  He was on a 2200 calorie diet recommended by the American Diabetes Association and had lost 68 pounds.  (Id.)  He had stopped working in November 2003 and was applying for disability.  (Id. at 301.)  Naproxen helped and had no side effects.  (Id. at 303, 307.)  On examination, straight leg raises[6] were positive on the left when sitting and negative when lying down.  (Id. at 304.)  He had a symmetric gait, but normal muscle strength. (Id. at

_____

[4]All amounts are rounded to the nearest dollar.

[5]See page 32, infra.

[6]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended."  **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

304, 307.) He had a good range of motion in his cervical spine. (<u>Id.</u>) The range of motion in his lumbar spine was limited by pain. (<u>Id.</u>) X-rays of his lumbar spine revealed a normal alignment with Grade I-II anterolisthesis of L5-S1; bilateral pars interarticularis defects at L5 with resultant L5-S1 facet arthropathy; and mild degenerative disc disease at T12-L1. (<u>Id.</u> at 231-32, 339-40.) The impression was of pars interarticularis defect at L5 bilaterally; Grade I anterolisthesis L5 on S1; chronic lumbago; status-post anterior fusion/discectomy at C4-5; bilateral neuropathic pain in his upper extremities; diabetes mellitus, Type 2; bilateral knee osteoarthritis; obesity; and lack of conditioning. (<u>Id.</u> at 308.) He was prescribed Neurontin and Baclofen, and his Naproxen prescription was renewed. (<u>Id.</u> at 304, 308) He was to start physical therapy, and was to have x-rays done of his lumbar spine. (<u>Id.</u>)

Two weeks later, Plaintiff was evaluated for physical therapy. (<u>Id.</u> at 344-55.) The precipitating event for his pain was reportedly a myelogram in 2002. (<u>Id.</u> at 344.) His current pain level, and his best pain level, was an eight. (<u>Id.</u>) He had pain in his left arm, hand, and knee and in his back. (<u>Id.</u>) Because of the pain, he had not worked as a chef since September 2003. (<u>Id.</u>) He was concerned about falling due to balance problems caused by medication and wanted a cane. (<u>Id.</u>) Because of his left knee pain, he had difficulty walking. (<u>Id.</u>) He had a limited range of motion in his lumbar spine on extension, rotation, and side bending. (<u>Id.</u> at 345-46.) The therapist noted that Plaintiff's responses to the range of motion testing "seem[ed] out of proportion to [the] activity." (<u>Id.</u> at 354.)

The physical therapy evaluation was continued the following week. (<u>Id.</u> at 356-57.) Goals included reducing his pain level to one or two to allow for his activities of daily living

and reducing the number of times he wakes up at night to two.  (Id. at 357.)  The sessions were to be held twice a week for six weeks.  (Id.)  In the ten weeks between March 3 and May 12, Plaintiff attended six physical therapy sessions.  (Id. at 358-64.)  At the first, March 3 session, the therapist reported that Plaintiff was "holding back" when performing the exercises, but was doing them without difficulty.  (Id. at 358.)  Without medication, his pain was a nine.  (Id.)  At the next session three weeks later, the therapist opined that Plaintiff's back pain might be better with a brace, and requested that one be ordered by his doctor.  (Id. at 359.)  Plaintiff's balance was better after he had finished his medications.  (Id.)  Plaintiff was wearing a back brace he had previously been given when he came for his next, April 7 session.  (Id. at 360.)  He was applying for jobs.  (Id.)  His back pain, still present, was a seven.  (Id.)  The following week, Plaintiff described his pain as an eight.  (Id. at 361.)  The therapist was continuing to try to get a brace ordered for him.  (Id.)  Plaintiff did not think he'd be able to return to work.  (Id.)  Two sessions later, on May 12, Plaintiff reported that he was trying to get disability.  (Id. at 363-64.)  He was wearing a lumbar brace, which reduced his pain level to a six or seven.  (Id.)  He was discharged from physical therapy.  (Id.)

While participating in physical therapy sessions, Plaintiff had a March appointment at the Pain Management Center.  (Id. at 309.)  He did not keep it.  (Id.)

He did keep his April 9 appointment at the Pain Management Center.  (Id. at 310-13.)  He reported that his chronic back pain was an eight on a ten-point scale.  (Id. at 310.)  It was noted that there had been no change in his functioning.  (Id. at 312.)  He was to continue with

his home exercise program and return in two months.  (Id.)  It was also noted that he had a back brace.  (Id.)

After his physical therapy sessions ended, Plaintiff underwent an initial psychological evaluation on June 1by Abidemi Adegbola, M.D.  (Id. at 233-40.)  He reported that he had been "[a]cting kind of down and out."'  (Id. at 238.)  He had no prior psychiatric history.  (Id.) He was unable to work as a result of medical problems with his C4 and C5 cervical discs and was waiting to hear about Social Security disability.  (Id.)  He had been separated from his wife, but they were now reuniting. (Id.)  They had four children, ranging in age from twenty-two years old to three years.  (Id. at 239.)  He described a history since 2002 of episodic poor moods, decreased interest in daily living activities, crying spells, "catastrophizing," and feelings of isolation.  (Id. at 238.)  His most recent episode of these symptoms began the past February and lasted for two months.  (Id.)  Although he was continuing to have "residual diminished interest in social activities," he was "satisfactorily" able to do his daily living activities.  (Id. at 239.)  He was angry at the government because he had not been awarded disability.  (Id.)  He attributed his "'depression'" to not being able to work.  (Id.)  He was suing Barnes for malpractice arising from the anesthesia he had been given when undergoing a myelogram.  (Id.)  Although he had had behavioral problems as a teenager, e.g., cruelty to animals and shoplifting, he did not have an adult history of antisocial behavior.  (Id.)  He drank alcohol only occasionally, smoked one pack of cigarettes a week, and no longer used street drugs. (Id.) His current medications included Naproxen, Neurontin, Baclofen, Metformin, and Vitamin E.  (Id.)  It was noted that he walked with a cane and wore a back brace.  (Id. at 239-

40.)  On examination, he was pleasant and cooperative, had good eye contact and normal speech, smiled easily, and had an euthymic affect and fair insight and judgment.  (Id. at 240.) He was alert and oriented to time, place, and person and was of an average intellect.  (Id.)  He perseverated on his inability to work.  (Id.)  Dr. Adegbola diagnosed Plaintiff with major depressive disorder in partial remission and a Global Assessment of Functioning (GAF) of 65.[7] (Id. at 238, 240.)  He noted that he had not been able to elicit from Plaintiff any of the symptoms of depression during the evaluation.  (Id. at 240.)  He also noted that "[Plaintiff] is a litigant seeking disability which might constitute a secondary gain for [him] to endorse these symptoms."  (Id.)  Accordingly, Plaintiff was to be followed to determine the consistency of those symptoms.  (Id.)  Dr. Adegbola prescribed Citalopram, referred Plaintiff to a social worker, and requested that he return in six weeks.  (Id.)

Two weeks later, Plaintiff had an x-ray of his cervical spine, revealing central canal stenosis at C3 through C7.  (Id. at 246-47.)  There was no motion of the fused segments at C4-5 with flexion and extension.  (Id. at 247.)

On June 21, Plaintiff reported to Charles Lieu, M.D., the physician at ConnectCare who treated his diabetes, that he had no new complaints.  (Id. at 217-18.)  He walked daily.  (Id. at

---

[7]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34 (emphasis omitted).

- 14 -

217.) His diagnoses included Type 2 diabetes, or diabetes mellitus, and obesity. (Id.) He was to return in four months. (Id. at 218.)

Three days later, Plaintiff was seen again at the Pain Management Center. (Id. at 314-17.) He reported that he walked two blocks a day and was sleeping well. (Id. at 314.) He had lost five pounds. (Id.) It was noted that Plaintiff was doing well on his current regimen and had good pain control. (Id. at 315.) He did have some left knee pain, and had been started on an antidepressant. (Id.)

On July 23, Plaintiff reported to a health care provider at Barnes Neurology Clinic that he was satisfied with his current level of pain control. (Id. at 250-56.) He also reported having persistent pain in his neck radiating down his left arm, particularly with movement, weakness and numbness in his left arm, weakness in his left leg, a slight residual numbness in his left arm, and difficulty walking. (Id.) He used a cane. (Id.) The provider noted that there had been no neurological deterioration since Plaintiff's previous visit. (Id.) Plaintiff was to continue going to the pain clinic and to have a magnetic resonance imaging (MRI) of his neck. (Id.) It was noted that over-the-counter pain medications "help[ed] some." (Id. at 255.) The MRI revealed postoperative changes of instrumentation and fusion at L4-5; degenerative disc disease resulting in mild multi-level stenosis; and, possibly, a cord injury at C4-5. (Id. at 342, 435.) Clinical correlation of the latter was recommended. (Id.)

When seen on August 23 at the Pain Management Center, Plaintiff reported having low back pain and left upper extremity pain. (Id. at 317-19.) The current pain level was nine on

- 15 -

a ten point scale; average was six to nine.  (Id. at 317)  His left arm pain was worse.  (Id.)  He was continuing to walk two blocks a day, but was depressed secondary to the pain.  (Id.)

Four days later, at the Barnes Neurology Clinic, Plaintiff described left shoulder pain that was a seven on a ten-point scale.  (Id. at 257-63.)  It was noted that there had been no neurological deterioration since the previous visit.  (Id. at 262.)  An MRI of his lumbar spine was still needed.  (Id.)  The MRI was performed, revealing bilateral facet osteoarthritis at L4-5 and L5-S1 levels, with the greatest severity at L5-S1 on the right side.  (Id. at 343, 436.)

Plaintiff was seen again on September 3 at the Clinic.  (Id. at 264-69.)  The pain in his right arm and hand was an eight on a ten-point scale.  (Id. at 266.)  He continued to have a sharp pain in his left shoulder that radiated to his left arm and fingers.  (Id. at 268.)  He also had numbness and tingling in his left upper extremity.  (Id.)  The pain was relieved by medication.  (Id.)  The provider noted that Plaintiff "likely" had cervical myelopathy and needed an injection to C3, C4, and C5.  (Id.)

Six days later, Plaintiff returned to physical therapy.  (Id. at 366-81.)  The diagnosis was cervical myelopathy.  (Id.)  The goal was to increase the range of motion in his left shoulder and reduce his pain level to a five or six.  (Id. at 367.)  The sessions were to occur twice a week for eight weeks.  (Id.)  At the second session, Plaintiff was reportedly sleeping better and was to get a knee brace.  (Id. at 372.)  At the fifth session, he was feeling much better.  At the seventh, he was getting better, but the pain stayed the same.  At the eight session, he had shown improvement.  At the tenth, on November 22, the pain was reportedly persisting. Plaintiff was to have surgery, and was discharged from physical therapy.

- 16 -

While undergoing physical therapy, Plaintiff returned to the Pain Management Center on October 4.  (Id. at 320-27.)  He described the pain in his left arm as aching, exhausting, and constant; in his low back as numb and constant; and in his left leg below the knee as numb.  (Id. at 321.)  The pain was worse in the afternoon, was aggravated by movement, and was lessened by medication and relaxing with his feet up.  (Id.)  On a ten-point scale for the degree to which it interfered with his activities of daily living, the pain was a seven – between partially and greatly interfering.  (Id.)  His weight was 210 pounds, and had not changed since his last visit.  (Id. at 323.)  It was noted that he had seen a neurosurgeon for his neck and had declined the offer of surgery.  (Id. at 324.)  He had an antalgic gait and walked with a cane.  (Id. at 325.)  He had decreased sensation in his left hand and decreased strength in his left upper extremity.  (Id. at 325, 327)  He had normal strength in his right upper extremity and his left lower extremity.  (Id. at 327.)  The diagnoses were cervical disc bulges from C3-4 with mild stenosis, disc bulge at L5-S1, and lumbar facet degenerative joint disease at L4-5 and L5-S1.  (Id.)  He was to have a lumbar epidural steroid injection at C5-6 and to continue taking Neurontin and Naprosyn.  (Id.)  He was to consider pain intervention for the lumbar spine, if necessary.  (Id.)

One week later, Plaintiff was seen by Dr. Lieu for his diabetes and obesity.  (Id. at 219-20.)  He reported that he was feeling well after having an injection in his neck for neuropathy.  (Id. at 219.)  He was to follow-up in four months.  (Id.)

- 17 -

The following week, Plaintiff called the provider at the Pain Management Center to advise that he had decided to undergo surgery and would not be having the steroid injection. (Id. at 328.)

Plaintiff was seen at the Barnes emergency room on November 24. (Id. at 270-82.) He reported that he almost fell off a second-story balcony. (Id. at 271.) He had pain on the right side, unrelieved by medication, and thought he had twisted his back. (Id.) X-rays of his chest and right ankle revealed contusions on both and were otherwise normal. (Id. at 274, 275.) Plaintiff was prescribed Oxycodone and Cyclobenzaprine, each to be taken as needed. (Id. at 273, 274.)

Plaintiff returned to the Pain Management Center on December 6. (Id. at 329-34.) He described his pain as being an average of six on a ten-point scale. (Id. at 329.) The pain was in his lower middle back and left arm, hand, and knee. (Id.) It was aggravated by standing too long, lifting, or bending. (Id.) It was alleviated by lying flat on his back. (Id.) Surgery on his neck was scheduled for the winter. (Id. at 332.) Plaintiff was to continue taking Neurontin and Naprosyn and to follow up as needed. (Id. at 334.)

The same day, Plaintiff began physical therapy for chronic back pain. (Id. at 382-92.) The sessions were to be once a week for six weeks. (Id. at 383.) At the third session, Plaintiff reported that his back was okay; his arm and hand were bothersome. At the next session, he complained of leg spasms during treatment and appeared to be plateauing. After the fifth session, he did not return and was discharged.

Plaintiff was seen at the Neurology Clinic in January 2005 for pain in his left shoulder and arm.  (Id. at 283-90.)  He was to continue with physical therapy – he was then in the middle of his sessions – and nerve root injections.  (Id. at 287.)  He was to return in three months, at which time an MRI of cervical spine would be performed.  (Id.)

In April, Plaintiff saw Dr. Lieu.  (Id. at 221-22.)  He weighed 210.5 pounds and complained of left knee pain.  (Id.)  He was to follow-up with the Barnes Neurology Clinic and Pain Management Center for his cervical myelopathy, and was to have an x-ray of his left knee.  (Id.)  A reduced calorie diet was discussed.  (Id.)

The following month, an MRI was performed at Missouri Baptist Medical Center, revealing status-post instrumentation and fusion procedure at C4-5; mild multi-level stenosis; and protrusions of the discs at C5-6 and C6-7.  (Id. at 437.)  As before, there was a question of cord atrophy and injury, for which clinical correlation was recommended.  (Id.)

Plaintiff returned to the Barnes Neurology Clinic in June.  (Id. at 291-95.)  A notation mistakenly reads that the MRI had not been done yet.  (Id. at 294.)  Plaintiff was to continue with physical therapy and return in six months.  (Id.)  X-rays taken of his cervical spine revealed status-post anterior cervical spinal fusion procedure at C4-C5 with no motion with flexion or extension and mild diffuse central canal stenosis of the cervical spine.  (Id. at 295.)

Plaintiff began physical therapy in July.  (Id. at 393-400.)  The following week, he reported some complaints of pain and greater difficulty getting in and out of the car.  He was not wearing braces.  At the second session the next week, he reported that his cane kept him from falling down and his medications made him sleepy.  Two weeks later, he reported a

decrease in low back pain during aqua therapy.  On August 9, it was noted that Plaintiff was making progress and would benefit from more appointments.  He was not in pain, was using a cane, and was to follow-up as needed.

Plaintiff's next medical record is of his December visit to Lawrence Wells, M.D., at the Myrtle Hilliard Davis Comprehensive Health Center (Davis Health Center) for complaints of stuffiness at night and status-post C4-5 discectomy.  (Id. at 439.)

Plaintiff returned to Dr. Wells in March 2006 for a routine check-up of his diabetes.  (Id. at 440, 471, 493.)  He reported having pain in his back, left leg, hands, and arms.  (Id. at 440, 471.)  The pain was an eight on a ten-point scale.  (Id.)  He had not taken any pain medication that day.  (Id.)  He needed a referral to a neurologist for his neck pain.  (Id.)

A computed tomography (CT) scan taken in April of his cervical spine revealed a small posterior central osteophyte at C4 near C4-5 in addition to the fusion device at C4-5.  (Id. at 434, 445.)

When Plaintiff saw Dr. Wells in June, he wore a back brace and left knee brace.  (Id. at 441-42, 471-73.)  His diabetes was controlled; his neck pain was not.  (Id. at 441.)  He was referred to an orthopedist for evaluation of the instability of his left knee and his cervical radiculopathy.  (Id.)

Consequently, Plaintiff was evaluated by an orthopedist[8] six days later.  (Id. at 430-31.)  Plaintiff reported complaints of pain in his neck, low back, and left upper extremity for the past five years.  (Id. at 430.)  The pain had worsened in the past year.  (Id.)  And, he was beginning

---

[8]The report is not signed.

- 20 -

to experience pain in his right upper extremity.  (Id.)  His current medications included Metformin, Naproxen, Gabapentin, Amitriptyline, and Flonase.  (Id.)  He reported that he has been disabled since 2002.  (Id. at 431.)  He wore a left knee brace, and walked with a decreased stride on the left due to knee pain.  (Id.)  On examination, Plaintiff had no obvious muscle weakness and had normal motor bulk and tone in both upper and lower extremities. (Id.)  Due to pain, his range of motion in his cervical spine was decreased in lateral flexion and on extension.  (Id.)  His range of motion was also decreased in his left shoulder and lumber spine.  (Id.)  Spurling's test was negative,[9] as was Patrick's test.[10]  (Id.)  Hawkin's sign[11] and Neer's test[12] were positive on the left.  (Id.)  The impression was of cervical degenerative joint disease, possible left C6-7 radiculitis, cervical stenosis, possible lumbar degenerative joint

---

[9]"In a patient with neck pain or pain that radiates below the elbow, a useful maneuver to further evaluate the cervical spine is Spurling's test. The patient's cervical spine is placed in extension and the head rotated toward the affected shoulder. An axial load is then placed on the spine. Reproduction of the patient's shoulder or arm pain indicates possible cervical nerve root compression and warrants further evaluation of the bony and soft tissue structures of the cervical spine." **Perkins v. Astrue**, 2011 WL 4378165, * 8  n.20 (E.D. Mo. 2011) (citing American Family Physician, The Painful Shoulder: Part I. Clinical Evaluation (May 15, 2000), available at: http://www.aafp.org/afp/20000515/3079.html).

[10]Patrick's test "is used to identify the presence of hip pathology by attempting to reproduce pain in the hip, lumbar spine and sacroiliac region." **Rice v. Astrue**, 2013 WL 275584, *4 n.3 (E.D. Mo. 2013).  "It is positive if the test produces pain in the hip or sacral joint or if the leg cannot be lowered to the point of being parallel to the opposite leg." **Price v. Astrue**, 2011 WL 4378210, *5 n.6 (E.D. Mo. 2011).

[11]The Hawkin's sign is a subchondral radiolucent band seen on x-rays of a bone after six to eight weeks of disuse or immobilization.  Edwin F. Donnelly, M.D., The Hawkins Sign, http://radiology.rsna.org/content/210/1/195.full (last visited Feb. 20, 2013).

[12]The Neer's test is used to diagnosis subacromial impingement and is performed by placing the arm in forced flexion with the arm fully pronated.  Thomas W. Woodward, M.D., and Thomas M. Best, M.D., Ph.D., The Painful Shoulder:  Part I. Clinical Evaluation, http://www.aafp.org/afp/2000/0515/p3079.html (last visited Feb. 20, 2013).

disease, and left rotator cuff tendinitis.  (Id.)  The doctor recommended (a) use of analgesics and nonsteroidal anti-inflammatory drugs (NSAIDS) and (b) an exercise program for rehabilitation of the cervical spine, lumber spine, and left shoulder.  (Id.)

The following month, Plaintiff was evaluated again by an orthopedist, Katherine A. Burns, M.D., for complaints of left knee pain.  (Id. at 432-33.)  He walked with "a mildly antalgic gait favoring the left side."  (Id. at 432.)  The left knee was not swollen and had a range of motion from 0 to 130 degrees.  (Id.)  He had some quad atrophy and weakness in his left side compared to the right side.  (Id.)  Although he complained of diffuse pain, his knee was ligamentously stable.  (Id.)  The diagnosis was left knee pain of unclear etiology and right bipartite patella.  (Id.)  Dr. Burns gave him a home exercise program.  (Id. at 433.)  He was to engage in activities as tolerated and follow up with her as needed.  (Id.)

Four months later, Plaintiff returned to Dr. Wells with complaints of nasal congestion and pain in his low back and left arm and hand.  (Id. at 442-43, 473-74, 492.)  Plaintiff was to follow-up for medication refills.  (Id. at 442.)

Plaintiff next saw Dr. Wells in February 2007 to request stronger pain medications.  (Id. at 476-77, 501-02.)

On May 18, complaining of back and neck pain for the past three days, Plaintiff was taken by ambulance to the emergency room at Barnes.  (Id. at 447-58.)  He reported that he had had chronic back pain since high school.  (Id. at 449.)  He had been running out of pain medications for the last month.  (Id. at 450.)  He sporadically took Naproxen.  (Id.)  Plaintiff described his pain as being gradual in onset and worse with movement.  (Id.)  He could not

remember any injury to his neck or back, "but state[d] he ha[d] been walking to get his kids a lot recently." (Id. at 449.) On examination, his neck was normal, supple, and not tender. (Id. at 451.) Straight leg raises were negative. (Id.) His left upper and lower extremities were weak, An x-ray of his thoracic spine was negative. (Id. at 458.) He was given hydromorphone, diagnosed with back pain, and discharged in stable condition. (Id. at 449, 452, 453.)

Four days later, he was again seen in an emergency room for complaints of back pain. (Id. at 461-68.)

The following day, on May 23, Dr. Wells noted that Plaintiff had been given a prescription for Percocet, but had not gotten it filled. (Id. at 478-79, 481-83, 492, 499-500.) Plaintiff was given a prescription for Vicodin. (Id. at 479.)

In September, Plaintiff saw Dr. Wells for a follow-up appointment and a refill of his prescriptions. (Id. at 497-98.)

In November, he went to Dr. Wells to have his medication prescriptions rewritten. (Id. at 497.) He had moved and lost all his medications. (Id.) He informed Dr. Wells that Vicodin was not helping. (Id.)

Plaintiff told Dr. Wells when he saw him in December that he did not need medication refills. (Id. at 495-96.) Plaintiff complained of neck, right foot, and left elbow pain – the last two being caused by a fall. (Id. at 495.) He had been referred to the pain management clinic at St. Louis University, but his insurance would not cover it. (Id. at 495.) He wanted a referral to the Barnes Pain Management Center and to a neurosurgeon. (Id.) Aside from the fall, he had had no decline in health since his last visit. (Id.) He was given both referrals, scheduled

- 23 -

for x-rays of his right foot and left elbow, and to return in one month for medication refills. (Id. at 496.) X-rays of his left elbow revealed a small olecranon spur. (Id. at 490.) X-rays of his right foot revealed a bone spur over the dorsal aspect of the neck of the talus. (Id. at 491.)

Plaintiff's medical records from 2008 consist of three visits to Dr. Wells, with the first being in May for a follow-up for his diabetes, hypertension, cervical fusion, and peripheral neuropathy. (Id. at 484-87.) Plaintiff had complaints of pain from left shoulder to hand and back pain. (Id. at 484.) He had no numbness or tingling in his limbs. (Id.) He needed refills of his pain medications. (Id.) It was noted that he had good exercise habits, walked daily, and was in no acute distress. (Id. at 484, 485.) On examination, his musculoskeletal system was normal. (Id. at 486.) His neck had no decrease in suppleness. (Id. at 485.) His medications included Percocet. (Id. at 486.) Plaintiff was to return in three months, and did. (Id.) In August, he saw Dr. Wells for a follow-up for his diabetes, refills of prescriptions, a and referral to pain management. (Id. at 530-32.) As before, he was reported to have good exercise habits. (Id. at 530.) "WALKS" was written in capital letters. (Id.) His functional status was "[n]o physical disability and activities of daily living were normal." (Id.) His back was described as normal, his neck as demonstrating no decrease in suppleness. (Id. at 531.) The assessment was of rhinitis; uncomplicated, controlled diabetes; peripheral neuropathy; and cervicalgia. (Id. at 532.) He was to be referred to pain management and return in three months. (Id.) His prescriptions were refilled. (Id.)

Plaintiff returned to Dr. Wells in November. (Id. at 526-29.) At this, follow-up visit, his exercise habits were described as poor; his functional status was unchanged. (Id. at 526.)

- 24 -

He had been given a referral to pain management, but had not gotten an appointment yet.  (Id.
at 527.)

In addition to the foregoing records of Plaintiff's medical treatment, the ALJ had before
him the assessments of examining and non-examining consultants.  One set of assessments
was completed in 2005; a second set was completed in 2008.

In February 2005, Plaintiff underwent a neuropsychiatric evaluation by John S. Rabun,
M.D.  (Id. at 401-05.)  Plaintiff's chief complaint was trouble with his left arm.  (Id. at 401.)
He reported being in treatment with a psychiatrist for a major depressive disorder that had
begun following his surgery for cervical disc disease, but he was not taking any psychiatric
medication.  (Id. at 401, 402.)  He was unable to work due to increased cervical pain and to
numbness and decreased strength in his left upper extremity.  (Id. at 402.)  Because of his lack
of employment, he was depressed, more emotional, did not enjoy formerly enjoyable activities,
felt "'worthless,'" and lacked energy.  (Id. at 401-02.)  He occasionally thought of suicide, but
had no plans to take his life.  (Id. at 402.)  On examination, Plaintiff had normal muscle tone
and bulk, and no muscle atrophy.  (Id.)  He complained of pain and tenderness in his lumbar
region, cervical spine, and left shoulder.  (Id.)  He had a normal range of motion in his knees,
elbows, and right shoulder, but a decreased range in his left shoulder on flexion and abduction.
(Id. at 402, 405.)  He demonstrated a reduced range of motion in his lumbar spine to ten
degrees on flexion and extension, but was observed at the end of the evaluation when picking
up his cane to have a full range of motion in the lumbar spine without pain.  (Id. at 402, 406.)
He had a reduced range of motion in his cervical spine.  (Id.)  His strength in his right hand

- 25 -

and upper and lower extremities was 5/5.  (Id. at 402-03, 405.)  In his left hand and upper and lower extremities, his strength was 4/5.  (Id. at 403, 405.)  He had normal fine finger movements in both hands.  (Id. at 403.)  He could not walk in a tandem manner or on heels and toes due to his low back pain.  (Id.)  When walking with Dr. Rabun to the office, Plaintiff walked slowly and used a cane; when leaving the officer, he walked "much quicker," but still used the cane.  (Id.)  Plaintiff informed Dr. Rabun that he needed the cane for balance; however, he could slowly walk without the cane during the neurological examination.  (Id.)  Plaintiff complained of depression, but did not show any symptoms indicative of a severe episode of depression, e.g., changes in affect, speech, or psychomotor activity.  (Id.)  His flow of thought was logical, sequential, and goal-directed; his speech was soft, but adequately modulated; his affect was serious and guarded; his mood was "'emotional'"; his insight and judgment were "preserved."  (Id. at 403-04.)  His recent and remote memory were intact.  (Id.)  Dr. Rabun diagnosed Plaintiff with depressive disorder, not otherwise specified (NOS),[13] and assessed his current GAF as 60.[14]  (Id. at 404.)  He summarized his findings as follows.

---

[13]According to the DSM-IV-TR, each diagnostic class, e.g., adjustment disorder, has at least one "Not Otherwise Specified" category.  DSM-IV-TR at 4.  This category may be used in one of four situations: (1) "[t]he presentation conforms to the general guidelines for a mental disorder in the diagnostic class, but the symptomatic picture does not meet the criteria for any of the specific disorders"; (2) "[t]he presentation conforms to a symptom pattern that has not been included in the DSM-IV but that causes clinically significant distress or impairment"; (3) the cause is uncertain; or (4) there is either insufficient data collection or inconsistent, contradictory information, although the information that is known is sufficient to place the disorder in a particular diagnostic class.  Id.

[14]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV-TR at 34 (emphasis omitted).

- 26 -

Although [Plaintiff] complained of symptoms found in depression, he did not show changes in speech, psychomotor activity, affect, or concentration consistent with a severe episode of major depression.  He also did not display disruptions in his concentration or memory due to his depression.  Further, he has the ability to interact appropriately in a social setting and adapt to changes in his environment, if he chooses to do so.  [Plaintiff] complained of pain in his cervical and lumbar region, though he had full range of motion in his lumbar region when he was picking up his cane, and not being formally tested.  When formally tested, he only was able to flex his lower back to 10 degrees.  This finding suggests some level of exaggeration on [Plaintiff's] part.  [Plaintiff] may have some limitations due to his pain and disk disease, though not as significant as he portrays.

(Id.)

An x-ray taken in March of Plaintiff's cervical spine showed a stable interbody at the C4- level.  (Id. at 407.)  An x-ray of his left shoulder was negative.  (Id.)

That same month, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by a non-medical evaluator.  (Id. at 408-15.)  The primary diagnosis was a herniated disc at C4-5, post fusion; the secondary diagnosis was cervical myelopathy.  (Id. at 408.)  These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and, stand, walk, or sit for approximately six hours in an eight-hour day.  (Id.)  Plaintiff had postural limitations of only occasionally balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs.  (Id. at 410.)  He should never climb ladders, ropes, or scaffolds.  (Id.)  He also had manipulative limitations of being limited in his abilities to reach and feel.  (Id. at 411.)  He had no visual, communicative, or environmental limitations.  (Id. at 411-12.)

Also in March, a Psychiatric Review Technique form (PRTF) was completed for Plaintiff by Terry L. Dunn, Ph.D.  (Id. at 416-29.)  Plaintiff was described as having an

affective disorder, i.e., depressive disorder, NOS, which resulted in Plaintiff having mild restrictions of activities of daily living and mild difficulties in maintaining concentration, persistence, or pace, but in no difficulties in maintaining social functioning.  (Id. at 416, 419, 426.)  The impairment did not cause any episodes of decompensation of extended duration. (Id. at 426.)

In August 2008, Plaintiff underwent a psychological evaluation by L. Lynn Mades, Ph.D.  (Id. at 503-11.)  He reported that he was last employed in 2005 as a line server in a cafeteria.  (Id. at 503.)  He complained of problems standing and walking and problems with his back, knees, and hands.  (Id.)  During the examination, "[h]e cried seeming for effect, starting and stopping quickly, complaining of feeling 'tired.'"  (Id.)  "He claimed that his hand 'had a mind of it's [sic] own,' even though he showed no difficulties manipulating objects." (Id.)  He reported that he had seen a doctor for depression sometime between 2003 and 2004, but could not recall the name of the doctor.  (Id. at 504.)  Although he used to be outgoing, he was now isolated and irritable.  (Id.)  His current prescriptions included Gabapentin, Amitriptyline, Naproxen, Metformin, Loratadine, Fluticasone, and Viagra, but, with the exception of the Viagra, none had apparently been used since being filled three weeks earlier. (Id.)  He had one year of college.  (Id. at 505.)  He had not been in special education classes, but had had some behavior problems in school, had been suspended several times, and had been expelled once.  (Id.)  His longest period of employment had been for two to three years. (Id.)  On examination, he was generally cooperative and pleasant, had an alert expression and good eye contact, and walked with a cane, although he did not appear to need it for support.

- 28 -

(Id.) He exhibited "unusual pain behaviors, with sudden grabbing of his shoulder or legs and crying out . . . ; once he was engaged in conversation, this behavior disappeared." (Id.) His speech was normal; his mood was euthymic to mildly depressed; his affect was full and generally appropriate; and his thought content was logical and without disturbances or delusions. (Id. at 505-06.) His insight and judgment were "[s]lightly limited." (Id. at 506.) His activities of daily living included taking care of such household chores as setting the table and working in the kitchen. (Id. at 507.) He got along adequately with others, although he was sometimes irritable. (Id.) Dr. Mades diagnosed Plaintiff with depressive disorder, NOS, and a GAF between 75 and 80.[15] (Id.) She also noted that:

> [Plaintiff] presents with multiple pain complaints, and with further questioning claimed problems with depression. He reported little in the way of depressive symptoms, however, and in general gave an unusual and exaggerated presentation highly suggestive of malingering. While there may be some underlying difficulties, his presentation showed multiple examples of significantly exaggerated complaints, including what appeared to be crying on cue, unusual pain behaviors not seen in chronic pain patients, and pain behaviors disappearing when engaged in conversation. No evidence of thought disturbance was noted during today's examination, and there was evidence of possible mild mood impairment by history and presentation.

(Id. at 507-08.)

Completing a Medical Source Statement of Ability to Do Work-Related Activities (Mental), Dr. Mades opined that Plaintiff's impairments did not affect his ability to (1)

---

[15]A GAF between 71 and 80 is described as "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors . . . ; no more than slight impairment in social, occupational, or school functioning . . . ." DSM-IV-TR at 34.

understand, remember, and carry out instructions, (2) interact appropriately with supervisors, co-workers, and the public, and (3) any other capabilities.  (<u>Id.</u> at 509-10.)

The same day, Plaintiff underwent a physical evaluation by Jack C. Tippett, M.D.  (<u>Id.</u> at 512-23.)  Plaintiff reported that he worked as a chef until 2001.  (<u>Id.</u> at 512.)  He then thought that he had a grease burn to his left hand because he did not seem to have any feeling in that hand.  (<u>Id.</u>)  He had been unable to have an MRI of the hand due to being claustrophobic.  (<u>Id.</u>) He did have a myelogram, but did not like the doctor who performed it. (<u>Id.</u>) Since that time, he has had pain in his low back and weakness in his left upper extremity and, to some extent, in his right upper extremity.  (<u>Id.</u>)  Approximately the same time, his right knee started to bother him; recently, his left knee has begun to hurt.  (<u>Id.</u>)  He wears a back brace and has removable knee supports. (<u>Id.</u>) Also, his right shoulder is sore.  (<u>Id.</u>)  When first seen in the examining room, he appeared to be asleep and "seemed to wake up when convenient."  (<u>Id.</u> at 513.)  He carefully rose from the chair, explaining that he could only walk when using a cane and wearing knee supports.  (<u>Id.</u>)  He could not stand on his toes or heels; he could not squat or bend forward.  (<u>Id.</u>)  When asked to demonstrate his range of motion in his neck, "he demonstrate[d] very little motion."  (<u>Id.</u>)  There was no muscle spasm.  (<u>Id.</u>)  He had "some tenderness" in his low back, but was able to tilt only slightly to the left and right and could not bend forward.  (<u>Id.</u>)  He was reluctant to move his left shoulder or left elbow.  (<u>Id.</u>) He had a normal range of motion in his wrists and hands.  (<u>Id.</u>)  The strength of his grasp with his right hand was 4/5 and with his left was 3/5.  (<u>Id.</u>)  "However, when he [was] removing the braces and placing them on his knees, he required perfectly normal strength with the right hand

and strength of 4/5 on the left side." (Id. at 513-14.)  Dr. Tippett noted that Plaintiff is right-handed.  (Id. at 514.)  Dr. Tippett's diagnosis was of status- post cervical discectomy with persisting weakness and numbness in his left upper extremity; chronic low back strain; unexplained soreness in both knees; and exaggeration of complaints throughout his body.  (Id.)  The weakness in Plaintiff's neck was present, but "seemed to be exaggerated during th[e] examination." (Id.)

On a Medical Source Statement of Ability to Do Work-Related Activities (Physical), Dr. Tippett opined that Plaintiff could occasionally lift and carry up to ten pounds with his right hand and less than that with his left; could sit for forty minutes at any one time without interruption and up to a total of eight hours in an eight-hour day; and could stand or walk for five minutes at any one time.  (Id. at 515-16.)  He needed a cane for support when walking. (Id. at 516.)  With his right hand, he could occasionally handle and finger and continuously feel.  (Id. at 517.)  He should never push or pull with that hand.  (Id.)  With his left hand, he could occasionally handle and frequently feel, but should never reach, finger, or push and pull. (Id.)  He should never operate foot controls due to knee problems and a decrease in motivation. (Id.)  He could occasionally climb stairs and ramps, balance, and stoop, but should never kneel, crouch, crawl, or climb ladders or scaffolds.  (Id. at 518.)  He should also never operate a motor vehicle or be around unprotected heights and moving mechanical parts. (Id. at 519.)  He could occasionally be around extreme cold and frequently be around extreme heat, humidity, and various pulmonary irritants, e.g., dust and fumes.  (Id.)  He could engage in such activities as preparing meals and walking a block at a reasonable pace on rough or uneven surfaces, but

should not engage in such activities as using standard public transportation or sorting or handling papers and files.  (Id. at 520.)

### The ALJ's Decision

After first noting that Plaintiff had previously been found, pursuant to earlier applications, to be disabled by his cervical spine discectomy and fusion surgery from January 24, 2003, through January 31, 2004, the ALJ then summarized Plaintiff's testimony in the two earlier hearings and the findings of the two prior decisions entered in Plaintiff's current case. (Id. at 21-23.)  He found that Plaintiff had impairments of "mild obesity, status-post cervical spine discectomy and fusion, diabetes mellitus with peripheral neuropathy, chronic low back strain, minor degenerative changes of the left elbow and right foot, a history of various other minor or acute musculoskeletal impairments, rhinitis, hyperlipidemia, erectile dysfunction, and a mild depressive disorder not otherwise specified . . . ."  (Id. at 29.)  These disorders, singly or in combination, did not meet or equal an impairment of listing-level severity."  (Id.)

The ALJ noted that Plaintiff's activities included helping his children with their homework, volunteering as a hall monitor and front desk clerk at their school two or three days a week for all day, riding with them to school and back on the bus, going on outings with them and their aunt, and going to the library once a week.  (Id. at 24.)  The ALJ also noted that Plaintiff had had an excellent work record through 2001, and that Plaintiff had continued to complain of upper extremity and neck pain in 2007 and wore a back support.  (Id. at 25.)

The ALJ next summarized the results of the two 2008 consultative examinations, and then concluded that Plaintiff's combined musculoskeletal impairments prevented him from

performing his past relevant work. (Id. at 25-26.) Plaintiff could, however, perform sedentary work with additional limitations of no climbing of ropes, ladders, or scaffolds; no use of the nondominant left upper extremity for fine manipulation or overhead reaching; and only occasional balancing, stooping, kneeling, crouching, crawling, or climbing of ramps. (Id. at 26.) According to the VE, there were jobs a claimant with these limitations could perform. (Id.)

The ALJ noted the VE's testimony that Plaintiff "would be unemployable if he needed a cane for nearly all standing and walking functions including riding public transportation, or if he could not use his hands and fingers for normal gross or fine manipulation, or if his attention and concentration were severely restricted because of pain or depression, or if the physical restrictions noted by Dr. Tippett . . . were medically accurate," but found that these limitations were not supported by the record. (Id. at 27.) For instance, Plaintiff's various musculoskeletal complaints were not well-defined and, in some respects, were exaggerated or not medically established. (Id.) His diabetes was "well controlled" and had not resulted in any secondary damage. (Id.) He had "had only periodic routine outpatient treatment in recent years." (Id.) "He ha[d] run out of medications several times, but there [was] no evidence that he ha[d] every been refused outpatient or inpatient medical treatment, medication or mental health counseling because of inability to pay." (Id.) None of his treating physicians have found, explicitly or implicitly, "that he is disabled or totally or seriously incapacitated" or have placed any specific long-term limitations on his physical functioning, e.g., his abilities to sit and stand. (Id.) The restrictions listed by Dr. Tippett in his Medical Source Statement were

subjective.  (Id.)  And, Dr. Wells, the treating physician with the longest longitudinal picture

of Plaintiff, noted on the most recent medical record that Plaintiff was not significantly limited

in his daily activities.  (Id.)  With respect to Plaintiff's use of a cane, the ALJ found his need

for such was "somewhat ambiguous,'" noting that Plaintiff had testified at the hearing "that he

had 'forgot' to bring his cane . . . ."  (Id. at 28.)

      The ALJ further found that Plaintiff's allegations of limitations that would preclude all

sustained work activity were not credible.  (Id. at 28-29.)

      For the foregoing reasons, the ALJ concluded that Plaintiff was not disabled within the

meaning of the Act.  (Id. at 29-33.)

### Legal Standards

      Under the Act, the Commissioner shall find a person disabled if the claimant "is unable

to engage in any substantial activity by reason of any medically determinable physical or

mental impairment which . . . has lasted or can be expected to last for a continuous period of

not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be

"of such severity that [the claimant] is not only unable to do his previous work, but cannot,

considering his age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy, regardless of whether . . . a specific job

vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C.

§ 1382c(a)(3)(B).

      The Commissioner has established a five-step process for determining whether a person

is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; **Moore v. Astrue**, 572 F.3d 520, 523 (8th

Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  Second, the claimant must have a severe impairment.  See 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  A severe  impairment is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  20 C.F.R. §§ 404.1520(c), 416.920(c).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits.  **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations."  **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)).  "'[A] claimant's RFC [is] based on all relevant evidence

- 35 -

including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "'(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting Moore, 572 F.3d at 524). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" **Id.** (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). Moreover, an ALJ is not required to methodically discuss each of the relevant credibility factors, "'so long as he acknowledge[s] and examine[s] those considerations before discounting a claimant's subjective complaints.'" **Renstrom v. Astrue**, 680 F.3d 1057, 1067 (8th Cir. 2012) (quoting Partee v. Astrue, 638 F.3d 860, 865 (8th Cir. 2011)).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The burden at step

four remains with the claimant.  **Moore**, 572 F.3d at 523; **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ is to find the claimant to be disabled.  See 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

The ALJ's decision – adopted by the Commissioner when the Appeals Council denied review – whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'"  **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)).  "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'"  **Perkins v. Astrue**, 648 F.3d 892, 897 (8th Cir. 2011) (quoting Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009)).  When reviewing the record, however, the Court "'must consider evidence that both supports and

detracts from the ALJ's decision, but [may not] reverse an administration decision simply because some evidence may support the opposite conclusion.'"  **Id.** (quoting Medhaug, 578 F.3d at 813).  "'If, after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'"  **Id.** (quoting Medhaug, 578 F.3d at 897). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ erred by failing to (1) properly consider, discuss, and weigh the opinion of Dr. Tippett about his functional limitations; (2) include all of Plaintiff's exertional limitations, including the severe limitations in the use of his hands as explained by Dr. Tippett, in the hypothetical questions asked the VE; and (3) properly assess his credibility and instead focusing on a few activities that can be accommodated by a structuring of his day. The Commissioner disagrees.

Dr. Tippett, a consulting examiner, opined that Plaintiff could, among other things, occasionally lift and carry up to ten pounds with his right hand and less than that with his left; could sit for forty minutes at any one time without interruption; could stand or walk for only five minutes at any one time; had to use a cane when walking; could only occasionally handle and finger with his right hand; could occasionally handle and frequently feel with his left hand; could not push or pull with either hand; and could not operate foot controls.  These limitations

are far more restrictive than those included by the ALJ in his RFC assessment.  Plaintiff argues that this exclusion is error.

"'It is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment.'" **Hacker v. Barnhart**, 459 F.3d 934, 939 (8th Cir. 2006) (quoting Harris v. Barnhart, 356 F.3d 926, 931 (8th Cir. 2004)).  When determining the weight to be given that opinion, the ALJ is to consider the factors in 20 C.F.R. §§ 404.1527(c), 416.927(c), including the examining relationship, the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability, and consistency.

Dr. Tippett did not have a treatment relationship with Plaintiff.  Rather, his relationship with Plaintiff was as a one-time examining consultant.[16]  The opinion of a consulting physician is not entitled to any special weight.  **Kirkby v. Astrue**, 500 F.3d 705, 709 (8th Cir. 2007); accord **Charles v. Barnhart**, 375 F.3d 777, 783 (8th Cir. 2004).  See also **Partee**, 638 F.3d at 864 (finding that ALJ "reasonably questioned" medical opinion when that opinion was outcome of disability evaluation).

Consideration of the "supportability" factor does not favor granting Dr. Tippett's opinion any weight.  The "supportability" factor provides that "[t]he more a medical source presents relevant evidence to support an opinion . . . the more weight" is to be given that opinion.  20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).  Also, "[t]he better an explanation a

---

[16]Dr. Tippett is identified only as an "M.D." and does not appear to be a specialist in any area. See 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5) (listing specialization as one of the factors to be considered when weighing a medical opinion).

source provides for an opinion, the more weight" is to be given that opinion.  Id.  The only

support for the limitations found by Dr. Tippett is Plaintiff's description of such,[17] yet Dr.

Tippett's examination findings consistently refer to Plaintiff exaggerating his symptoms.  For

instance, Plaintiff demonstrated decreased grip strength on examination, but was observed to

have greater strength when using his hands for an unrelated purpose.  Based on Plaintiff's

complaints, Dr. Tippett concluded he could not stand or walk for longer than five minutes and

that he needed a cane for support; however, Plaintiff (a) informed the health care providers at

the emergency room that he had been frequently walking, (b) had testified that he walked with

his children to the bus, including without use of his cane, (c) informed Dr. Wells, his treating

physician, that he walked for exercise, (d) had forgotten his cane when at the third

administrative hearing, and (e) had been observed at one consulting examination walking

without relying on a cane.  This reliance on Plaintiff's subjective complaints is further

illustrated by Dr. Tippett's conclusion that Plaintiff should not use public transportation,

although Plaintiff rode with his children to their school on a public bus two or three times a

week.  Dr. Tippett having clearly based his opinion about Plaintiff's exertional limitations on

Plaintiff's subjective complaints, the ALJ did not err in not giving that opinion controlling

weight.  See **Renstrom**, 680 F.3d at 1065 (ALJ properly gave treating physician's opinion non-

controlling weight when that opinion was largely based on claimant's subjective complaints

and was inconsistent with other medical experts); **McCoy v. Astrue**, 648 F.3d 605, 617 (8th

---

[17]As noted by the Commissioner, the objective medical evidence, i.e., the MRIs, the x-rays, and the CT scans, routinely fail to reveal any findings supportive of Dr. Tippett's opinion.  See Commissioner's Brief at 6.

- 40 -

Cir. 2011) (rejecting claimant's challenge to lack of weight given treating physician's evaluation of claimant's mental impairments when "evaluation appeared to be based, at least in part, on [claimant's] self-reported symptoms and, thus, insofar as those reported symptoms were found to be less than credible, [the treating physician's] report was rendered less credible"); **Kirby**, 500 F.3d at 709 (finding that ALJ was entitled to discount treating physician's statement as to claimant's limitations because such conclusion was based primarily on claimant's subjective complaints and not on objective medical evidence).

Consideration of the consistency factor also militates against granting Dr. Tippett's opinion any weight. This factor provides that more weight is to given an opinion the more consistent it is with the record as a whole. 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). As discussed above, see note 17, supra, the limitations are not supported by the objective medical record, reports by Plaintiff to his treating physician, or by his activities.

Plaintiff also argues that the ALJ's failure to specify the weight he was giving Dr. Tippett's opinion requires reversal and remand. Whatever error may have been committed by the ALJ not labeling the weight he was giving to Dr. Tippett's opinion has "no bearing on the outcome" given his discussion of the pertinent frailties of that opinion. See **Hepp v. Astrue**, 511 F.3d 798, 806 (8th Cir. 2008) (repeating earlier holdings that an unfortunate deficiency in opinion-writing technique does not require reversal when the deficiency had no bearing on outcome) (internal quotations omitted).

Plaintiff next challenges the ALJ's RFC findings. Specifically, the ALJ's failure to incorporate into those findings the manual dexterity restrictions found by Dr. Tippett. As

- 41 -

noted above, "[t]he RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,' despite his or her physical or mental limitations." **Roberson v. Astrue**, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *3 (July 2, 1996)).  "When determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own description of her or his limitations, as well as medical records, and observations of treating physicians and others." **Roberson**, 481 F.3d at 1023.  See also SSR 96-8p, 1996 WL 374184 at *5 (listing factors to be considered when assessing a claimant's RFC, including, among other things, medical history, medical signs and laboratory findings, effects of treatment, medical source statements, recorded observations, and "effects of symptoms . . . that are reasonably attributed to a medically determinable impairment").

Plaintiff further argues that the ALJ's finding that Plaintiff had additional limitations, e.g., an inability to use his nondominant left upper extremity for manipulation and overhead reaching, that narrows the range of sedentary work he can perform mandates a finding of disability.  Both Plaintiff and the Commissioner cite Social Security Ruling 96-9p in support of their opposite arguments.  That Ruling provides:

> 1. An RFC for less than a full range of sedentary work reflects very serious limitations resulting from an individual's medical impairment(s) and is expected to be relatively rare.
>
> 2. However, a finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of "disabled."  If the performance of past relevant work is precluded by an RFC for less than the full range of sedentary work, consideration must still be given to whether there is other work in the national economy that the individual is able to do, considering age, education, and work experience.

SSR 96-9p, 1996 WL 374185, *1 (July 2, 1996).  Thus, the Ruling does not require a finding

of disability if a claimant cannot perform the full range of sedentary work.  Instead, it requires

that the ALJ consider whether there is other work in the national economy that a claimant with

the RFC for less than that range can perform.  The VE described such work that Plaintiff could

perform.  There is no error.

In his final argument, Plaintiff challenges the ALJ's assessment of his credibility.  He

first notes that the ALJ failed to discuss the many efforts he has taken to obtain pain relief.

Such efforts may reflect positively on a claimant's credibility.  Cf. **Hepp**, 511 F.3d at 807

(detracting from claimant's credibility was his use of moderate, over-the-counter medication

for pain); **Howe v. Astrue**, 499 F.3d 835, 841 (8th Cir. 2007) (detracting from claimant's

credibility was the lack of any prescription pain medication).  For the reasons set forth below,

however, other considerations support the ALJ's assessment.  These considerations are not

outweighed by the ALJ's failure to cite a potentially positive consideration.  See **Partee**, 638

F.3d at 865 ("The ALJ is not required to discuss methodically each [credibility] consideration,

so long as he acknowledged and examined those considerations before discounting [a

claimant's] subjective complaints.") (internal quotations omitted) (second alteration in

original).

One such detracting consideration was the failure of any of Plaintiff's treating

physicians to place any functional limitations on him.  See **Teague v. Astrue**, 638 F.3d 611,

615 (8th Cir. 2011) ("Given that none of Teague's doctors reported functional or work related

limitations due to [her allegedly disabling impairment], there was a basis to question Teague's

- 43 -

credibility."); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1038 (8th Cir. 2001) (affirming adverse credibility determination based, in part, on lack of any functional restrictions placed on claimant by her doctors).  Indeed, his primary treating physician, Dr. Wells, reported that Plaintiff was not disabled and not significantly limited in his daily activities.

Drs. Rabun, Mades, and Tippett each referred to Plaintiff as exaggerating his symptoms and/or malingering.  This behavior detracts from his credibility.  See **Jones**, 619 F.3d at 973; **Baker v. Barnhart**, 457 F.3d 882, 892 (8th Cir. 2006).  Moreover, Dr. Rabun noted the discrepancy between Plaintiff's walk when he was being observed and when he was not and between his complaints of depression and the lack of any symptoms of such; Dr. Mades remarked that he cried on cue; and Dr. Tippett observed the difference in Plaintiff's grip strength during the examination and when he was removing his braces.  See also **Jones v. Callahan**, 122 F.3d 1148, 1152 (8th Cir. 1997) (affirming ALJ's adverse credibility determination based, in part, on report of treating physician that there was a discrepancy between claimant's "'appearance in the examining room and those outside when he did not know that he was observed'" (quoting report of claimant's treating physician).

Another detractor was his testimony that he continued to look for restaurant work after his alleged disability onset date.  See **Lansford v. Barnhart**, 76 Fed.Appx. 109, 110 (8th Cir. 2003) (per curiam); **Mitchell v. Sullivan**, 907 F.2d 843, 844 (8th Cir. 1990).

The ALJ also properly considered the lack of ongoing medical treatment sought by Plaintiff and the periods when he was noncompliant with his medication.  **Casey v. Astrue**, 503 F.3d 687, 693 (8th Cir. 2007) (failure to seek regular treatment is not consistent with

complaints of disabling pain).  Although Plaintiff testified that the reference in the emergency room medical records to him not taking his medications was during a time when he did not have Medicaid, he did not produce any evidence that he had attempted to obtain low cost medical treatment, including medication, and was denied treatment and medication because of his financial hardship.  **Murphy v. Sullivan**, 953 F.2d 383, 386-87 (8th Cir. 1992).  Nor does the one reference to lack of Medicaid explain the several references in Dr. Wells' records to Plaintiff misplacing and losing his medication.

Additionally, although "'[a]n ALJ may not discount a claimant's subjective complaints solely because the objective medical evidence does not fully support them,'" **Renstrom**, 680 F.3d at 1066 (quoting Wiese, 552 F.3d at 733), the absence of objective medical evidence to support a claimant's complaints is a proper consideration when assessing that claimant's credibility, **id.** at 1065.  Accord **Buckner**, 646 F.3d at 558; **Mouser v. Astrue**, 545 F.3d 634, 638 (8th Cir. 2008).  As described above, see pages 10 to 30, supra, there is a clear lack of supporting objective medical evidence in the instant case.

Another inconsistency exists between Plaintiff's subjective complaints and his daily activities.  "[A] claimant 'need not be totally bedridden in order to be unable to work' . . . ." **Wagner**, 499 F.3d at 851 (quoting Roberson, 481 F.3d at 1025).  See also **Reed v. Barnhart**, 399 F.3d 917, 923-24 (8th Cir. 2005) (noting that the Eighth Circuit "has repeatedly observed that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work").  Plaintiff, however, testified about such limitations as being unable to walk farther than one

- 45 -

block, but has forgotten his cane when walking to the bus stop with his children.  He testified about an inability to remember and concentrate, but goes to the library once a week to check out books on history and helps his children with their homework in the evenings.  He does volunteer work during the school day at his children's school two or three times a week.

"An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole."  **Van Vickle v. Astrue**, 539 F.3d 825, 828 (8th Cir. 2008).  The ALJ discussed the inconsistencies he found that lessened Plaintiff's credibility.  The ALJ having supported his credibility assessment with good reasons, this Court defers to his judgment. <u>See</u> **Finch**, 547 F.3d at 935.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision.  "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently."  **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010).  Accordingly,

- 46 -

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Order shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  25th  day of March, 2013.